**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

**GEORGES-LUCIEN DE RATAFIA and DIANE ACKROYD,**

                                        **Plaintiffs,**

- against-                                                          **1:13-CV-174**
                                                                    **(NAM/RFT)**

**THE COUNTY OF COLUMBIA, a Political Subdivision of**
**the State of New York, SHERIFF DAVID W. HARRISON, JR.,**
**in his Individual and Official Capacities, DEPUTY SHERIFF**
**DAVID PROPER, in his Individual and Official Capacities,**
**DEPUTY SHERIFF TODD HYSON, in his Individual and**
**Official Capacities, DEPUTY SHERIFF DAVID ROSE, in his**
**Individual and Official Capacities, and Henry Meleck a/k/a**
**Henry Wrenn-Meleck,**

                                        **Defendants.**
:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

**APPEARANCES:**                                    **OF COUNSEL:**

OFFICE OF GLENN BACKER                              Glenn Backer, Esq.
280 Madison Avenue, Suite 300
New York, New York 10016
*Attorney for Plaintiffs*

GOLDBERG SEGALLA, L.L.P.                            Jonathan M. Bernstein, Esq.,
8 Southwoods Boulevard, Suite 300                   Matthew S. Lerner, Esq.
Albany, New York 12211-2526
*Attorneys for County Defendants*

GALLET DREYER & BERKEY, LLP                         David S. Douglas, Esq.
845 Third Avenue, 8th Floor                         Adam M Felsentein, Esq.
New York, New York 10022-6601
*Attorneys for Defendant Henry Wrenn-Meleck*

**NORMAN A. MORDUE, Senior United States District Judge:**

                    <u>**MEMORANDUM-DECISION and ORDER**</u>

**I.      INTRODUCTION**

        This case arises under the auspices of 42 U.S.C. § 1983, the New York State constitution

and New York common law. Plaintiffs assert that the defendant Sheriff Deputies violated their constitutional rights under federal and state law as a result of forcibly entering their home without cause and committing various torts against them including assault and battery. Presently before the Court are two motions to dismiss by the County defendants and defendant Meleck seeking dismissal or partial dismissal of the complaint on various grounds. Plaintiff opposes both motions. There is an "unofficial" third motion filed by the County in opposition to dismissing defendant Meleck from this action on the ground that the County is entitled to seek contribution from him should it be found liable to plaintiffs on any of their claims. Meleck opposes this request by the County.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from plaintiffs' complaint. Plaintiffs and defendant Meleck are all New York County residents who maintain separate residences in Chatham, New York. Chatham, New York is located in Columbia County, New York. Plaintiff de Ratafia is a 61 year old retired real estate investor with financial interests in Columbia County. de Ratafia generally resides in New York, New York. Plaintiff Ackroyd is de Ratafia's fiancé. She is a New York State licensed nurse practitioner and a board certified psychiatric therapist. She is presently the director of psychiatric emergency services at Long Island Jewish/Lenox Hill Hospital in Manhattan. de Ratafia and Ackroyd occupy de Ratafia's property in Columbia County on various occasions year round.

According to plaintiffs, defendant Meleck is a businessman with full time professional commitments in New York County, New York. Defendant Meleck occupies his property in Columbia County on weekends and other occasions.

In or about mid-September 2011, Meleck "entered upon the de Ratafia property without warning or invitation and engaged de Ratafia and Ackroyd in conversation." During the course of this meeting, de Ratafia and Ackroyd requested that in the future, Meleck not enter upon their property unannounced as their view from their home to the street and the long drive was "obscured by thick forest and de Ratafia was concerned over the prospect of unseen thieves and wild animals approaching [his] home." Thereafter, Meleck sought out de Ratafia and Ackroyd's conversation and company on the de Ratafia property.

On Sunday, October 16, 2011, in the late afternoon, de Ratafia invited Meleck to visit the de Ratafia House for food and conversation. After Meleck accepted the foregoing invitation and stated that he could not drive because he had been drinking alcohol, de Ratafia picked up Meleck at Meleck's house and took him to the de Ratafia house. Meleck spent approximately four hours with de Ratafia and Ackroyd at their home. During the course of the late afternoon and early evening, de Ratafia and Ackroyd offered Meleck food and Meleck's choice of non-alcoholic and alcoholic beverages. Meleck continually helped himself to both food and several glasses of wine and requested several other helpings of liquors.

During the course of the evening, de Ratafia, Ackroyd and Meleck engaged in discussion relating to their respective heritage and background. During the visit de Ratafia told Meleck at some length that among other things: (a) de Ratafia's family is Jewish and had been decimated by the Nazis during the Holocaust; (b) his surviving family had been dispossessed and had been relegated to itinerant travel in Europe and internment in refugee camps; (c) he spent several years in a displaced persons' camp and a Jewish orphanage together with other displaced Jewish and other ethnic minority Holocaust survivors; (d) after emigrating to the United States, in tandem

-3-

with his work, de Ratafia and his elderly mother had become very active in the expatriate refugee community; (e) he cooperated with the Washington, D.C. Holocaust Museum by providing photographs of his family's experience after the Nazis displaced and persecuted his family; and (f) he had financially supported the restoration of Jewish cemeteries desecrated by the Nazis after the invasion of Poland.

During the visit, de Ratafia also showed Meleck a large framed photo collage depicting various stages of de Ratafia's life, his family's experience and scattering after the Holocaust, including photographs of parents, children and relatives murdered by the Nazis and survivors along with their Polish saviors. During the visit, Meleck actively engaged de Ratafia and Ackroyd in discussion of the Holocaust and volunteered that his family was partially of Jewish heritage. During the visit, de Ratafia and Meleck also discussed their mutual enjoyment of antique cars and interest in a local film festival. Meleck mentioned his interest in being introduced to female companions de Ratafia and Ackroyd might know. During the visit, Meleck asked for and was given a tour of the de Ratafia House.

de Ratafia drove Meleck to his home at approximately 9:00 p.m.. Upon arrival at Meleck's home, the lights were out and the area around Meleck's house was very dark. Thus, at Meleck's request, de Ratafia escorted Meleck to the door and assisted putting on the lights before departing. Meleck stated that he sometimes was uncomfortable at night alone in his house because it was isolated from other neighbors' properties and he feared intruders. After de Ratafia assisted Meleck in illuminating the house, Meleck asked de Ratafia in for a drink, but de Ratafia declined as Ackroyd was home alone, it was late and he wanted to return to his home and retire for the evening. Before de Ratafia returned to his car, Meleck thanked de Ratafia for his

-4-

hospitality, said that he hoped to have de Ratafia and Ackroyd over to introduce them to some of Meleck's neighbors in Columbia County, gave de Ratafia his New York City residential and business contact information, and said he wanted to socialize with de Ratafia and Ackroyd in Manhattan, travel with de Ratafia to an upcoming antique car show and film festival, and meet eligible female companions through Ackroyd.

de Ratafia arrived at his house at approximately 9:15 p.m. and retired with Ackroyd at approximately 10:45 p.m. in an upstairs bedroom. At or about 11:15 p.m. while in bed with Ackroyd, de Ratafia heard noise outside the house. de Ratafia immediately went downstairs to investigate, saw one or more flashlights shining through the glass front door, heard no voices, had no knowledge who was outside, and did not see any vehicular or emergency lights or other indications that the person(s) were present with vehicles or had any legitimate purpose to be outside his door at that hour. de Ratafia screamed that the person(s) should leave the area immediately and that he was calling the police. de Ratafia yelled upstairs to Ackroyd to call the police. Ackroyd remained upstairs, unaware of the situation on the ground floor other than hearing de Ratafia yelling, and could not understand what de Ratafia was saying.

There was no response from the person(s) outside the de Ratafia house except that one or more of the persons began to bang on the door and turn the door handle. de Ratafia picked up an unloaded shotgun he kept in the de Ratafia House for protection from bears and yelled that the police had been summoned. de Ratafia kept the shotgun pointed away from the door at all times.

de Ratafia approached the front door with the shotgun pointing at the floor and again yelled that the person(s) outside the door should leave before the police arrived. One or more of the persons outside the front door shouted that de Ratafia should drop the shotgun. de Ratafia

-5-

immediately placed the shotgun on the floor.  In the next few seconds, the door flung open and three persons, whom de Ratafia still could not see clearly in the dark, immediately ran into the house.  Although de Ratafia had already placed the shotgun on the floor before the door was forced open, one or more of the intruders shouted at de Ratafia to drop the gun and all three Intruders pointed guns at de Ratafia.

de Ratafia screamed that the shotgun was not loaded and warned again that the police had been summoned.  As one of the intruders pointed a gun directly at de Ratafia and ordered him to lie on the floor, de Ratafia immediately attempted to comply, but two of the intruders grabbed de Ratafia, threw him to the floor, which is uncarpeted stone, and one of the intruders held a gun to de Ratafia while another placed his knee forcefully in de Ratafia's back as he lay on the floor. de Ratafia screamed that he was in pain and respiratory distress and asked that he be allowed to stand up but the intruders did not respond.

At that moment, Ackroyd approached the second floor landing in a state of undress and yelled for the intruders not to harm de Ratafia.  At least one of the intruders pointed his weapon at Ackroyd and ordered her not to move.  As de Ratafia's dog ran down the stairs barking, one of the intruders pointed a weapon at the dog and ordered Ackroyd to restrain the animal or he would shoot it.  The intruders would not allow de Ratafia to rise and told him to "Shut the f-- up" multiple times.  As one of the intruders kept his knee in de Ratafia's back despite de Ratafia's shouts of pain and respiratory distress, another forcefully yanked and twisted de Ratafia's arms behind his back and applied tight metal handcuffs, again provoking de Ratafia's yells of distress and request that he be allowed to rise.

After several minutes, one of the intruders identified the group as the Deputy Sheriffs,

-6-

turned on a light, and ordered de Ratafia and Ackroyd not to move.  At the same time, one of the Deputy Sheriffs ordered Ackroyd to remove the dog from the area.  Ackroyd summoned the dog, which was not threatening the Deputy Sheriff, and asked that she be allowed to put on clothes before coming downstairs.  After putting on clothing, Ackroyd descended the stairs and demanded that the Deputy Sheriffs release de Ratafia, stating that he had a heart condition, and they obviously were hurting him.

When de Ratafia asked the reason for the home invasion, one of the Deputy Sheriffs again told de Ratafia to "Shut the f- up" and asked if he had any other weapons on his person.  de Ratafia was wearing only a loose sleeveless t-shirt and boxer shorts that could not have concealed any weapon and de Ratafia said the only other weapon was an ornamental antique unloaded rifle mounted on the mantle.  One of the Deputy Sheriffs then roughly grabbed de Ratafia and threw him up against the wall, repeated his order that de Ratafia not speak, and ordered that he remain still.  de Ratafia advised that he was having trouble breathing, had a heart condition, and was in pain both from the rough treatment and from the wrenching of his arms behind his back to apply the tight restraints, which he said were cramping his neck and shoulder.  When de Ratafia asked the Deputy Sheriffs to loosen the restraints, the one nearest De Ratafia, who still had his weapon in hand, told de Ratafia to "keep your f- ing mouth shut."

Without asking permission, two of the three Deputy Sheriffs began to search the de Ratafia house without explaining the object of their search or making any other comment.  de Ratafia said that the Deputy Sheriffs had no right or invitation to invade or search his house and·told them to leave, but the Deputy Sheriffs did not respond and continued searching the house.

Ackroyd asked that the Deputy Sheriffs loosen the hand restraints, allow de Ratafia to sit

-7-

down, determine whether he needed medical assistance, and explain the purpose of their invasion. One of the Deputy Sheriffs responded curtly that they had received a complaint from a neighbor. None of the Deputy Sheriffs offered de Ratafia medical assistance or requested medical assistance for de Ratafia. After searching the house, one of the Deputy Sheriffs twice said in substance to de Ratafia and Ackroyd, "Do you know we almost killed you?"

Ackroyd asked that she be allowed to examine de Ratafia, repeating that he had a heart condition, and again asked why the Deputy Sheriffs burst into their home and assaulted them. The Deputy Sheriffs allowed Ackroyd to examine de Ratafia but otherwise summoned no medical assistance or expressed any concern over de Ratafia's condition or injuries. Ultimately one of the Deputy Sheriffs removed the restraints from de Ratafia's hands and allowed him to sit down at the dining room table with Ackroyd sitting next to him. de Ratafia again asked the Deputies to leave, but they would not.

de Ratafia said that he was in pain and would be willing to respond to any questions the Deputy Sheriffs had in the morning by traveling to the Department with counsel and again requested that the Deputy Sheriffs leave his home. Two of the Deputy Sheriffs persisted in detaining and questioning de Ratafia and Ackroyd with respect to Meleck's visit earlier in the evening. de Ratafia summarized the cordial visit with Meleck advised the Deputy Sheriffs that unless they had information to the contrary, they should leave his home immediately.

Ackroyd confirmed de Ratafia's summary asking the Deputy Sheriffs to leave so she could determine whether de Ratafia should be taken to the hospital. The Deputy Sheriffs then left the de Ratafia House without further comment, except that they forbade de Ratafia's further contact with Meleck.

-8-

After exiting the house, the Deputy Sheriffs remained on the de Ratafia Property for another 1O to 15 minutes and then left the de Ratafia property in two department vehicles. Plaintiffs allege that defendant Deputies Proper, Hyson and Rose participated in the "home invasion, assault and other illegal activities" at their home.  de Ratafia and Ackroyd were not taken into custody.  No charges ever were lodged against de Ratafia or Ackroyd.  No explanation was ever provided to de Ratafia or Ackroyd of the reason for the invasion and assault prior to de Ratafia pressing for an explanation in subsequent days and weeks.

On December 16, 2011, de Ratafia traveled to the Columbia County Sheriff's Department administrative offices in Hudson, New York to request an explanation of the invasion and assault, but the Department spurned de Ratafia's inquiry and advised that it lacks supervisory control over or knowledge of the daily activities of its Deputies.

According to the Sheriff's report of an incident that occurred on October 16, 2011, Meleck placed a 911 call requesting dispatch of Sheriffs deputies or the police.[1]  In response to Meleck's 911 call, the Department dispatched a patrol car to Meleck's house.  Deputies Proper and Hyson interviewed Meleck at his house.  Deputies Proper and Hyson took Meleck's statement that de Ratafia had invited Meleck to his home for drinks and appetizers and he agreed. Meleck said he was given a ride by de Ratafia to his residence.  The report stated that Meleck said "they were all drinking a lot of wine..."  Meleck also "admitted to having a few drinks and still being under the influence and did not wish to sign a complaint."  Meleck could not articulate any "veiled threats" which he alleged de Ratafia had made.  Meleck's said that de

---

[1]

   Plaintiffs allege that all 911 calls are recorded by the Department and that the Department received Meleck's 911 call but erased the recording of it.

Ratafia "... started making comments about him being Jewish ...", but did not identify any threatening remarks de Ratafia made in respect to Meleck's religion or in any other regard. Meleck told the police that "... he f[elt] ... de Ratafia may be a dangerous person ..." but he did not articulate any reason other than that de Ratafia "is always vague about what he does for a living." "Meleck could not provide patrol with any direct threats made by ... de Ratafia but just stated that he feels threatened."

Meleck told the Deputies that he accepted a ride home from de Ratafia and that "...de Ratafia repeatedly called him a Jew throughout the ride home he was given and thought he was going to hurt him", but Meleck did not say why he had this thought. Meleck said "he [was] scared to stay home tonight and feels that ... de Ratafia will come back and hurt him" but could not state the basis for his belief. Meleck told the Deputies he "would like patrol to speak with de Ratafia to see what he says."

Thereafter, one or more of the defendant Deputy Sheriffs advised Meleck that they intended to travel to de Ratafia's house on the basis of his report. Meleck told the Deputies that de Ratafia feared unannounced visitors based upon his prior experience of making an unannounced visit to de Ratafia's home. At the time that Meleck made his October 16, 2011, report, Meleck was aware that de Ratafia kept a "shotgun which was on a chair near the front door," although Meleck made no allegation that de Ratafia had threatened him with a weapon.

On the basis of Meleck's report, defendants Proper and Hyson took Meleck to the house of another neighbor, Barry Biederman, for the evening. The Sheriff's report stated that without any forewarning to de Ratafia or Ackroyd, defendants Proper, Hyson and Rose, located and entered upon the de Ratafia property and proceeded into the house.

For more than a week after making the October 16, 2011 report, Meleck made no effort to contact the Sheriff's Department or any of the Deputy Sheriffs. On October 18, 2011, Deputy Hyson attempted to contact Meleck to follow up on his report, but Meleck did not respond for almost a week. On October 24, 2011, Meleck again told Deputy Hyson and possibly other members of the Sheriff's Department, that he still purportedly was afraid of de Ratafia but could not articulate any basis for his fear and still did not want to sign a complaint against de Ratafia. On October 24, 2011, when pressed by one or more of the individual Deputy Sheriffs to substantiate his purported fear, the only statement that Meleck could offer as a basis of his fear was that de Ratafia had offered him non-Kosher sausage during the October 16, 2011, visit. On October 24, 2011, when pressed further, Meleck stated, for the first time, that during the ride de Ratafia gave Meleck to his house at the end of the October 16, 2011, evening, he believed de Ratafia had said he could hurt or blackmail Meleck, "but he [couldn't] remember the exact words." Meleck also told the Deputies during this follow-up interview that de Ratafia had drugged him on October 16, 2011. When asked the basis for this accusation, Meleck stated that he had a "burning sensation" in his head upon arriving home "but didn't know if something was put in his drink or not."

Plaintiffs commenced the present action in July 2012, alleging that the elected Sheriff, defendant Harrison, the defendant Deputy Sheriffs and Meleck were involved in a joint venture and conspiracy to violate their constitutional rights under the Fourth, Fifth, Sixth and Fourteenth Amendments. Plaintiffs assert the following causes of action in the complaint against all defendants: (1) a section 1983 Fourth Amendment violation claim (Count I); (2) a section 1983 Fifth and Fourteenth Amendment violation claim (Count II); (3) a section 1983 Fifth and Sixth

Amendment violation claim (Count III); (4) a New York State Constitution violation claim (Count IV); (5) a common law assault and battery claim (Count V); (6) a common law assault claim (Count VI); (7) a common law false arrest claim (Count VII); (8) an intentional infliction of emotional distress claim (Count VIII); (9) a negligent infliction of emotional distress claim (Count IX); (10) a failure to intervene claim under section 1983 and common law (Count X); (11) a section 1983 and common law supervisor liability claim (Count XI); and (12) a claim for injunctive relief (Count XVI). Plaintiffs also assert a respondeat superior claim against defendant County of Columbia only (Count XII). Plaintiffs also assert punitive damages against the defendant County. The remaining counts in the complaint relate to defendant Meleck only. Count XIII alleges defamation, Count XIV asserts intentional infliction of emotional distress; and finally, Count XV claims negligent infliction of emotional distress.

The County defendants bring this motion to dismiss pursuant to Fed. R. Civ. P 12 (b) (6) any and all claims against defendant Sheriff David W. Harrison, Jr. including that part of Count XI alleging common law supervisor liability; (3) all state claims against the County of Columbia except the vicarious liability claim (Count XII); (4) all official capacity claims against the individual defendants; (5) Count III in its entirety alleging a § 1983 Fifth and Sixth Amendment violation; (6) Count IV in its entirety alleging violations of the New York State Constitution; (7) Count XVI in its entirety seeking injunctive relief; and (8) any punitive damages claim against the County of Columbia.

Defendant Meleck also moves to dismiss plaintiffs' claims against him on the ground that he is a private individual and thereby cannot be liable under 42 U.S.C. § 1983. Meleck also argues that plaintiffs' common-law claims against him must be dismissed since Meleck did not

participate in the police raid at plaintiffs' home on October 16, 2011. Meleck urges the Court not to exercise supplemental jurisdiction over plaintiffs' state law claims because the federal causes of action are deficient. The County defendants oppose defendant Meleck's motion to dismiss in part. While the County defendants agree with Meleck's position that plaintiffs have failed to state any claim under 42 U.S.C. against him, they assert that they have the right to seek contribution from Meleck in connection with plaintiffs' state law claims.

## III.    DISCUSSION

### A.    Standard of Review

The standard applicable to motions to dismiss are well-settled. On a motion to dismiss pursuant to Fed. R. Civ. P. 12 (b) (6), the Court must accept the allegations of the complaint as true, and draw all reasonable inferences in favor of the nonmoving party. *See Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998); *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995). In addition, the Court may not dismiss the complaint unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Nettis v. Levitt*, 241 F.3d 186, 191 (2d Cir. 2001) (quotation omitted). Therefore, the issue before the Court on such a motion "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *King v. Simpson*, 189 F.3d 284, 287 (2d Cir. 1999) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).

### B.    Claims against Sheriff Harrison

### 1.    Liability under 42 U.S.C. § 1983

The Court notes in the first instance that defendant Harrison is sued in both his official and

-13-

personal capacities. Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. *See, e.g., Scheuer v. Rhodes*, 416 U.S. 232, 237-238 (1974). Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dep't. of Soc. Servs.*, 436 U.S. 658, 690, n. (1978). As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. *Brandon v. Holt*, 469 U.S. 464, 471-472 (1985). Thus, because plaintiffs have sued Columbia County in this case, their claims against Sheriff Harrison in his official capacity are redundant to the County's potential § 1983 liability and must be dismissed. *See e.g. Beckwith v. Erie County Water Auth.*, 413 F. Supp.2d 214, 225 (W.D.N.Y. 2006).[2]

As to the federal claims against Harrison personally, the law is clear that personal involvement is a prerequisite to an award of damages against an individual defendant in an action arising under 42 U.S.C. § 1983. *See Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986). Thus, "[a] supervisory official cannot be liable solely on account of the acts or omissions of his or her subordinates." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citation omitted). In *Ashcroft v. Iqbal*, ––– U.S. ––– 129 S.Ct. 1937, 1948 (2009), the Supreme Court held that "[b]ecause vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the

---

[2] Indeed, the Court notes that all of the official capacity claims against the moving defendants should be dismissed as redundant of the claims against the County in this case. *See Cea v. Ulster County*, 309 F. Supp.2d 321, 327 (N.D.N.Y. 2004) (an official capacity suit is, in all respects other than name to be treated as a suit against the entity). Consequently, the Court also dismisses the claims against defendants Proper, Hyson & Rose in their official capacities.

Constitution."

Some courts have interpreted the *Iqbal* decision as abrogating several of the categories of supervisory liability enumerated by the Second Circuit in *Colon*, 58 F.3d at 873.[3]  *See e.g.*, *McNair v. Kirby Forensic Psychiatric Center*, 2010 WL 4446772, at *6 (S.D.N.Y., November 05, 2010) ("only two *Colon* categories survive after *Iqbal*—(1) a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation, and part of (3) if that supervisor creates a policy or custom under which unconstitutional practices occurred. . . . The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated—situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate.").  Other courts have disagreed with this narrow interpretation of Iqbal.  *See, e.g., Delgado v. Bezio*, 2011 WL 1842294, *9 (S.D.N.Y. May 9, 2011); *Qasem v. Toro*, 737 F.Supp.2d 147, 152 (S.D.N.Y. Aug. 10, 2010); *D'Olimpio v. Crisafi*, 718 F.Supp.2d 340, 347 (S.D.N.Y.2010), *aff'd*, 462 F. App'x 79 (2d Cir. 2012); *Sash v. United States*, 674 F.Supp.2d 531 (S.D.N.Y. 2009).   This Court agrees with the analysis in *Sash, supra*, that "[i]t was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution."  *Id.* at 544

---

[3]  Under *Colon*, "[t]he personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." 58 F.3d at 873.

(internal citation omitted). Thus, as in the present case, where the claim does not require a showing of discriminatory intent, the personal-involvement analysis set forth in *Colon* should still apply. *See id.* (citation omitted); *D'Olimpio*, 718 F.Supp.2d at 347. Hence, the court refers to earlier Second Circuit precedent that applies the tests of deliberate indifference or gross negligence to assess supervisory liability. That analysis demands a showing of actual or constructive notice to the supervisory defendant of constitutional torts committed by their subordinates. *Sash*, 674 F.Supp.2d at 544.

Here, plaintiffs fail to make any allegations against defendant Harrison, the elected Sheriff of Columbia County, that suggest he had any actual or constructive knowledge of, or responsibility for the alleged deprivation of plaintiff's civil rights when the defendant Deputy Sheriffs made their alleged illegal entry into plaintiffs' home and violated their rights. Plaintiffs assert that defendant Harrison, the defendant Deputy Sheriffs and defendant Meleck were involved in a "joint venture and conspiracy" to violate their rights. "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (citing *Carson v. Lewis*, 35 F.Supp.2d 250, 271 (E.D.N.Y. 1999). Nowhere do plaintiffs identify the specific personal actions defendant Harrison - or for that matter, any of the other purported participants - took in furtherance of this alleged joint venture and conspiracy. In order to state a claim of conspiracy under § 1983 the complaint must contain more than mere conclusory allegations. *See, e.g., Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir.), *cert. denied*, 506 U.S. 819 (1992); *Salahuddin v. Cuomo*, 861 F.2d 40, 43 (2d Cir. 1988); *Ostrer v.*

*Aronwald*, 567 F.2d 551, 553 (2d Cir. 1977) (per curiam); *Albany Welfare Rights Organization Day Care Center, Inc. v. Schreck*, 463 F.2d 620, 622–23 (2d Cir. 1972), *cert. denied*, 410 U.S. 944 (1973). A plaintiff should make an effort to provide some "details of time and place and the alleged effect of the conspiracy." 2A MOORE'S FEDERAL PRACTICE ¶ 8.17[6], at 8–109 to 8–110 (2d ed. 1992). Thus, complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; "[d]iffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ostrer*, 567 F.2d at 553; *Salahuddin*, 861 F.2d at 43.

Nowhere in the nearly three hundred paragraphs of the complaint, do plaintiffs flush out the direct manner in which defendant Harrison allegedly violated their rights. Instead, plaintiffs assert that defendant Harrison "failed to properly train and supervise" the officers involved in the incident at plaintiffs' home. However, "the existence of a municipal policy or practice, such as a failure to train or supervise, cannot be grounded solely on the conclusory assertions of the plaintiff." *Santos v. New York City*, 847 F. Supp.2d 573, 577 (S.D.N.Y. 2012). Nowhere do plaintiffs provide any factual allegations to support their assertions that the Deputy Sheriffs' actions in this case were due to a failure by defendant Harrison to train properly his officers. Nor does the complaint identify in what way the Sheriff's Department training was insufficient, nor the manner in which there was a failure to train.

Plaintiffs also assert that defendant Harrison "knew or should have known that the Deputy Sheriffs eventually would be faced with the type of vague, indefinite report from an inebriate that Meleck gave" on October 16, 2011, and "promulgated no standards for evaluation or supervisory review of the Deputy Sheriffs' response to such unreliable reports." However, absent from the

complaint are any facts establishing or suggesting the alleged basis for defendant Harrison's knowledge or awareness of the likelihood that his Deputies would respond in the manner they did herein to the complaint of a drunkard.

It is apparent from review of the complaint that the claims as presently stated against defendant Harrison could only be supported pursuant to respondeat superior or vicarious liability doctrines, which do not support liability under § 1983. Because plaintiffs fail to allege any facts that would allow the court to "draw the reasonable inference that [defendant Harrison] is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678, the federal claims in the complaint as to defendant Harrison must be dismissed for failure to state a claim. Specifically, the Court refers to Counts I, II, III, X, and XI to the extent that they assert claims under 42 U.S.C. § 1983 against defendant Harrison.

2.     State Law Claims

Insofar as plaintiffs' state law claims against defendant Harrison, there are no factual allegations which establish or suggest that defendant Harrison personally committed any acts which could be considered tortious under New York law. Indeed, in every instance, plaintiffs assert that the alleged illegal conduct of the defendant Deputy Sheriffs was committed "under the authority" of defendant Harrison's office. It is well-settled that a Sheriff cannot be held personally liable for the acts or omissions of his deputies while performing criminal justice functions, and that this principle precludes vicarious liability for the torts of a deputy. *Barr v. Albany County*, 50 N.Y.2d 247, 257 (1980) (citing *Flaherty v. Milliken*, 193 N.Y. 564, 569 (1908); *Foyster v. Tutuska*, 25 A.D.2d 940, 940-41 (4th Dep't 1966); *Isereau v. Stone*, 3 A.D.2d 243, 4th Dep't 1957) ("the deputies in this case were discharging criminal duties of the sheriff's

-18-

office and as such were in the service of the public and the sheriff may not be held personally liable for their alleged acts of negligence, misfeasance or nonfeasance." ).  Thus, Count X, which asserts "failure to intervene"against defendant Harrison and, Count XI which alleges  "supervisory liability" under New York common law must be dismissed.  In the absence of factual allegations establishing that defendant Harrison was personally involved in the alleged state law torts of assault, battery, false arrest, intentional infliction of emotional distress and negligent infliction of emotional distress, these claims (Counts V, VI, VII, VIII and IX) also fail to state a cause of action under New York law.

Finally, to the extent that Count IV asserts claims against defendant Harrison under the New York constitution, the New York Court of Appeals has recognized a "narrow" private right of action for violations of the search and seizure provision of the state constitution, *Brown v. State*, 89 N.Y.2d 172, 192 (1996).  However, it is unavailable where an alternative remedy will adequately protect the interests at stake, *see Coaklev v. Jaffe*, 49 F.Supp.2d 615, 628-29 (S.D.N.Y. 1999), *aff'd on other grounds*, 234 F.3d 1261 (2d Cir.2000) (citing *Remley v. State*, 174 Misc.2d 523, 525-26 (Ct. Cl. 1997); *Wahad v. Federal Bureau of Investigation*, 994 F.Supp. 237, 240 (S.D.N.Y.1998) (existence of alternative damage remedies under Section 1983 obviates need to imply a private right of action under the State Due Process Clause).  Here, the plaintiffs have stated a viable claim against the defendant Deputies under § 1983 for violation of their federal constitutional rights.  Thus, plaintiff's duplicative claim under the New York State Constitution must be dismissed.

C.      Claims Against Columbia County

1.      Respondeat Superior

The Court notes that the defendant County does not seek dismissal of Count XII of the complaint. However, plaintiffs' Twelfth Cause of Action asserts liability against the defendant County based on the principle of respondeat superior. It is long-settled that the language of § 1983, "read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable **unless action pursuant to official municipal policy of some nature** caused a constitutional tort." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). "[A] municipality cannot be held liable solely because it employs a tortfeasor - or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id.* There are no allegations in the complaint that the defendant County's actions or inactions in this case amounted to an official unlawful policy. Thus, plaintiffs' allegations of respondeat superior liability, standing alone, are insufficient to state a claim against the defendant County under 42 U.S.C. § 1983. Consequently, plaintiffs' claims against the County in Counts I, II, III, X, XI and XII, to the extent that they assert federal causes of action, must be dismissed.

Moreover, the County and Sheriff cannot be held vicariously liable for any alleged negligence on the part of the defendant deputy Sheriffs in this case. *See Trisvan v. County of Monroe*, 26 A.D.3d 875, 876 (4th Dep't 2006) (" we cannot say that the interest [s] of the [parties] 'in the subject-matter is such that they stand or fall together and that judgment against one will similarly affect the other' ") (quoting *Mondello v. New York Blood Ctr.-Greatere New Blood Program*, 80 N.Y.2d 219, 226 (1992)). Further, it is well established that "[a] county may not be held responsible for the negligent acts of [a] Sheriff [or] his deputies on the theory of respondeat superior, in the absence of a local law assuming such responsibility" . *Marashian v. City of Utica*,

214 A.D.2d 1034, 1034 (4th Dep't 1995); *Smelts v. Meloni*, 306 A.D.2d 872, 873 (4th Dep't 2003) *lv. denied* 100 N.Y.2d 516 (2003); *see also Barr v. County of Albany*, 50 N.Y.2d 247, 255–257 (1980). Here, plaintiffs have not suggested any such local law exists. *See Smelts*, 306 A.D.2d at 873. Thus, plaintiffs raise tort claims against the County in Count XII based on New York State law, those claims must be dismissed.

2.      Intentional Infliction of Emotional Distress

The defendant County moves to dismiss the claim in Count VIII for intentional infliction of emotional distress. Counsel for the County argues correctly that it is "well-settled that public policy bars claims sounding in intentional infliction of emotional distress against a government entity." *Rivera v. City of New York*, 392 F.Supp.2d 644, 657 (S.D.N.Y. 2005) (quoting *Lauer v. City of New York*, 240 A.D.2d 543, 544 (2d Dep't 1997)).

3.      Negligent Infliction of Emotional Distress

In the first instance, to establish liability for the intentional infliction of emotional distress, plaintiffs are required to show that defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Tartaro v. Allstate Indem. Co.,* 56 A.D.3d 758, 759 (2nd Dep't 2008). That same test is applied to causes of action for the negligent infliction of emotional distress (*see Chime v. Sicuranza*, 221 A.D.2d 401, 403 (2nd Dep't 1995) ("conduct complained of was not so outrageous in character and extreme in degree that it surpassed the limits of decency and would be regarded as atrocious and utterly intolerable in a civilized society"); *Burrell v. Int'l Assn. of Firefighters*, 216 A.D.2d 346, 356 (2nd Dep't 1995). There are **no** factual allegations by plaintiffs herein that the County engaged in any conduct in this case, much less outrageous or extreme conduct. The only factual allegations in the

complaint relate to actions taken by the defendant Deputy Sheriffs.  As a further matter, there are no allegations that the County committed any acts of negligence.  Consequently, the negligent infliction of emotional distress claim must be dismissed as against the County.  *See Marmelstein v. Kehillat New Hempstead*, 11 N.Y.3d 15, 20 (2008) (trial court dismissed negligent infliction of emotional distress claim for lack of an allegation that defendant committed any negligent acts).

Second, because the actions alleged plaintiffs' complaint here were "intentional and deliberate and . . . in their nature offensive," they are "outside the ambit of actionable negligence." *Wahlstrom v. Metro-North Commuter R. Co.*, 89 F. Supp. 2d 506, 531-32 (S.D.N.Y. 2000) (quoting *Jones v. Trane*, 153 Misc.2d 822, 825 (Sup.Ct.1992); *see also* Prosser & Keeton, LAW OF TORTS § 10, at 46 (5th ed. 1984) ("There is, properly speaking, no such thing as a negligent assault.").  This Court is mindful that "New York Courts have rejected uniformly such attempts to transmogrify intentional torts into 'negligence.' " *Schmidt v. Bishop*, 779 F.Supp. 321, 324–25 (S.D.N.Y. 1991) (dismissing negligence claim by plaintiff who alleged that her priest sexually abused her); *see also Wilson v. Diocese of N.Y. of Episcopal Church*, No. 96 Civ. 2400, 1998 WL 82921, at *6 (S.D.N.Y. Feb. 26, 1998) (citing cases).  For this additional  reason, plaintiffs' negligent infliction of emotional distress claim must be dismissed.

4.    Balance of Claims Against County

There are no factual allegations which could create liability on the part of the County in any of the causes of action against "all defendants," including the County premised on violations of New York State law and the New York State Constitution in the complaint.  Indeed, there is no mention of any conduct on the part of the defendant County anywhere in Counts IV, V, VI, VII, VIII, X, XI that could conceivably subject it to liability.  In the absence of plaintiffs pleading the

manner in which the County actively contributed to the incident which is the subject of the litigation at issue herein and their alleged injuries and damages, these causes of action must be dismissed to the extent they assert liability against the County.

D.     Violation of Plaintiffs' Fifth and Sixth Amendment Rights

Plaintiffs assert in Count III, that their rights under the Fifth Amendment were violated by the Deputy Sheriffs because they were not provided with *Miranda* warnings or their right to counsel prior to being interrogated.  However, the Second Circuit has clearly established that even if it can be shown that a statement was obtained by coercion, there is no Fifth Amendment violation until that statement is introduced against the defendant in a criminal proceeding.  *See Weaver v. Brenner*, 40 F.3d 527, 535 (2d Cir. 1994).  In *Weaver*, the Court held that to constitute a Fifth Amendment violation "use of the [coerced] statement at trial is not required," but that there must be some "use or derivative use of a compelled statement at any criminal proceeding against the declarant." 40 F.3d at 535.  Here, the complaint asserts that no criminal charges were ever brought or instituted against plaintiffs.  Thus, the Court finds that plaintiffs' Fifth Amendment claims against the defendant Deputy Sheriffs in Count III must be dismissed.

Likewise, plaintiffs' Sixth Amendment claim against the defendant Deputy Sheriffs fails because a person's Sixth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him.  *See Kirby v. Illinois*, 406 U.S. 682, 688 (1972).  "Since plaintiff [s] had not been arrested or charged with any crime at the time of questioning, [their] Sixth Amendment right[s] had yet to attach."  *Krug v. County of Rennselaer,* 559 F.Supp.2d 223, 246 (N.D.N.Y. 2008) (citing *Contes v. City of New York*, 1999 WL 500140, at *8 (S.D.N.Y. July 14, 1999) (balance of citations omitted)).  Consequently,

plaintiffs' Sixth Amendment Claims against the Deputy Sheriffs in Count III must be dismissed.

E.     New York State Constitutional Claims

As referenced above, plaintiffs have stated a viable claim against the defendant Deputies under § 1983 for violation of their federally protected rights. Thus, plaintiff's duplicative claim against the defendant Deputies under the New York State Constitution in Count IV for violation of these rights must be dismissed.

F.     Injunctive Relief

Plaintiffs assert in Count XVI that they have a fear of continued surveillance, invasions and assaults by the Sheriff's Department and the Deputy Sheriffs. However, they do not allege any facts in support of their claim that they have been subjected to continued surveillance, invasions or threatened assaults. Nor do they state the factual basis for their belief that they will be subjected to continued surveillance, invasions, or assaults in the future. Defendants argue correctly that plaintiffs must show that they "ha[ve] sustained or [are] immediately in danger of sustaining some direct injury" as the result of the challenged official conduct and the injury or threat of injury must be both "real and immediate," not "conjectural" or "hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)). Consequently, plaintiffs have failed to adequately plead a claim for injunctive relief and this claim must be dismissed.

G.     Punitive Damages

Plaintiffs seek punitive damages against the County which claim is barred as a matter of

-24-

law.  *See Sharapata v. Town of Islip*, 56 N.Y.2d 332, 336 (1982).  Thus, plaintiffs' punitive damages claim against the County must be dismissed.

H.      Claims Against Defendant Meleck

1.      Meleck's Liability under § 1983

Plaintiffs argues that Meleck, a private citizen, acted under color of state law.  In essence, they claim, Meleck lied to the defendant Deputy Sheriffs, who then unlawfully invaded plaintiffs' home and assaulted them, although no criminal charges were ever brought against them.

There are circumstances under which conduct " 'that is formally "private" may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action.' "  *Kia P. v. McIntyre*, 235 F.3d 749, 757 (2d Cir. 2000) (quoting *Perez v. Sugarman*, 499 F.2d 761, 764–65 (2d Cir. 1974)) (additional citation omitted).  However, "[f]or a private individual or entity to be deemed to have been acting under color of state law, the allegedly unconstitutional conduct of which plaintiff complains must be 'fairly attributable to the state.' "  *Bishop v. Toys "R" Us–NY LLC*, 414 F.Supp.2d 385, 396 (S.D.N.Y. 2006) (quoting *Tancredi v. Metro. Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003)) (additional internal quotation marks omitted), *cert. denied*, 539 U.S. 942 (2003).  Conduct will be "fairly attributable to the state" where there is " 'such a close nexus between the [s]tate and the challenged action that seemingly private behavior may be fairly treated as that of the [s]tate itself.' "  *Bishop*, 414 F.Supp.2d at 396 (quoting *Tancredi*, 316 F.3d at 312).

Significant here, "[a] merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity."  *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002).  There must be proof of a "plan,

-25-

prearrangement, conspiracy, custom or policy," *Ginsberg v. Healey Car & Truck Leasing Inc.*, 189 F.3d 268, 272 (2d Cir. 1999), that is, a " 'meeting of the minds' between [a state actor] and private individuals." *Manbeck v. Micka*, 640 F.Supp.2d 351, 379 (S.D.N.Y. 2009) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970), 398 U.S. at 158); *see Chodkowski v. City of N.Y.*, No. 06–cv–7120, 2007 WL 2717872, at * 10 (S.D.N.Y. Sept. 11, 2007); *see also Tancredi*, 316 F.3d at 313 ("State action may properly be found where the state exercises coercive power over, is entwined in [the] management or control of, or provides significant encouragement, either overt or covert to, a private actor, or where the private actor operates as a willful participant in joint activity with the State or its agents, is controlled by an agency of the State, has been delegated a public function by the state, or is entwined with governmental policies."); *Prowisor v. Bon–Ton Inc.*, 426 F.Supp.2d 165, 170 (S.D.N.Y. 2006), *aff'd*, 232 F. App'x 26 (2d Cir. 2007). The mere reporting of information to law enforcement is insufficient to support a claim of state action by a private party. *See Zaidi v. Amerada Hess Corp.*, 723 F.Supp.2d 506, 514 (E.D.N.Y. 2010) (citing *Ginsberg*, 189 F.3d at 272). Even providing false information to the police does not alone make a private individual a state actor for the purposes of § 1983. *See Chodkowski*, 2007 WL 2717872, at *9 (citing *Johns v. Home Depot U.S.A. Inc.*, 221 F.R.D. 400, 405 (S.D.N.Y. 2004)) ("[E]ven assuming [the defendant] had supplied the police with false information, plaintiff would still fail to state a claim."); *Gotbetter v. Port Auth. of N.Y. & N.J.*, No. 98–cv6762, 2000 WL 328044, at *2 (S.D.N.Y. Mar. 28, 2000) ("Although plaintiffs argue in their memorandum of law that defendant [ ] instigated their arrest by providing false information to police officers, they offer no evidence of a conspiracy."); *see also Collins v. Christie*, No. 06–cv4702, 2007 WL 2407105, at *4 n. 9 (E.D. Pa. Aug. 22, 2007) ("[E]ven if [the defendant] intentionally provided the false information

to the police, the plaintiff would still fail to state a claim under § 1983."). To support a § 1983 claim against a private actor, plaintiffs must also plead bad faith on the defendant's part. *See Chodkowski*, 2007 WL 2717872, at *9.

Here, there is no allegation in the complaint of an agreement, a plan or meeting of the minds between Meleck and the defendant Deputy Sheriffs to violate plaintiffs' rights. Although plaintiffs contend that Meleck instigated the invasion of their home by providing false information to the defendant Deputies, they offer no evidence of a conspiracy. Indeed, as the Court stated in *Concepcion v. City of New York*, 2008 WL 2020363, *7 (S.D.N.Y. May 07, 2008):

> [P]laintiff[s] [are] not relieved at this stage of the case of [their] obligation to allege facts-beyond mere "conclusory, vague, or general allegations"-sufficient to plausibly assert the existence of an agreement between a state actor and a private party to inflict an unconstitutional injury. *Ciambrello*, 292 F.3d at 324-25. Plaintiff[s'] allegations in the [complaint] fail to satisfy this standard. Indeed, . . . the [complaint] fails to . . . allege [sufficiently] that [Meleck's] interactions with [the defendant Deputy Sheriffs] constituted an agreement to violate plaintiff[s'] civil rights, or that the overt acts listed in the [complaint] were done in furtherance of such an agreement. Therefore, assuming the truth of plaintiff[s'] allegations and drawing all reasonable inferences in [their] favor, the Court finds, for the following reasons, that plaintiff[s'] ha[ve] failed to amplify [their] conclusory allegations of conspiracy with sufficient facts regarding an illegal agreement among defendants in order to state a conspiracy claim that is plausible on its face.

Thus, the Court finds that Counts I, II, and III, to the extent that they assert claims against Meleck under 42 U.S.C. § 1983, must be dismissed.

2.      Meleck's Liability Under the New York Constitution

As referenced above, "[n]o explicit constitutional or statutory authority sanctions a private right of action for violations of the New York State Constitution," *Wahad*, 994 F.Supp. at 238 (citing *Brown*, 89 N.Y.2d at 186), where such an action would not pass muster if properly pled in

-27-

a § 1983 action. Thus, plaintiff's claim in Count IV against Meleck under the New York Constitution must be dismissed.

3.      Meleck's Liability For State Claims Against "All Defendants"

Plaintiffs include defendant Meleck in their claims against "all defendants" for violations of various state tort laws, including assault, battery, false arrest and failure to intervene. Obviously, Meleck was not present when the defendant Deputy Sheriffs went to plaintiffs' home and committed the alleged torts upon them. In the absence of factual allegations or predatory acts by Meleck demonstrating or suggesting that Meleck was personally involved in these intentional acts, these claims must be dismissed as against him. Consequently, the Court finds that Counts V, VI, VII, VIII, IX and X must be dismissed insofar as they assert claims against defendant Meleck.[4]

4.      Defamation

A statement is defamatory if " 'it tends to expose the plaintiff to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." ' *Rinaldi v. Holt, Rinehart & Winston, Inc*., 42 N.Y.2d 369, 379 (1977), *cert . denied*, 434 U.S. 969 (1977). To establish a defamation claim, New York law requires that a plaintiff prove "(1) an oral defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party by the defendant, and (4) injury to the plaintiff." *Boyd v. Nationwide Mut. Ins. Co.*, 208 F.3d 406, 409 (2d Cir. 2000). A communication made by an individual to a law enforcement officer is deemed a "qualified privelege" for purposes of measuring immunity from suit. *See Toker v. Pollak*, 44 N.Y.2d 211, 220 (1978):

---

[4] Plaintiffs acknowledge that they "inadvertantly" identified Count XI of the Complaint - "Supervisory Liability" as applying to Meleck - and agree to withdraw this claim.

-28-

A qualified privilege is sufficient to foster the public purpose of encouraging citizens to come forth with information concerning criminal activity. If the information is given in good faith by an individual who believes the information to be true, he is protected against the imposition of liability in a defamation action, notwithstanding that another, perhaps possessed of greater wisdom, would not have reported the information. . . . Only those who act out of malice, rather than public interest, need hesitate before speaking. It is in these latter instances that "(p)roof of such indirect motive will defeat the privilege which would otherwise have attached, for it is not to the convenience and welfare of society that false and injurious communications as to the reputation of others should be made, not for the furtherance of some good object, but for the gratification of an evil and malicious disposition or for any other object than that which gave rise to the privilege.

*Id.* at 221 (quoting GATLEY, LIBEL AND SLANDER (3d ed.), p. 216.))

To puncture the qualified privilege and establish liability, a plaintiff must show that the defendant made untrue statements and abused the privilege by "acting beyond the scope of the privilege, acting with common law malice, or acting with knowledge that the statement was false or with a reckless disregard as to its truth." *Boyd v. Nationwide Mut. Ins. Co.*, 208 F.3d 406, 410 (2d Cir. 2000). *See also Golden v. Stiso*, 279 A.D.2d 607, 608 (2d Dep't 2001) (holding that plaintiff has burden to show that defendant was motivated "solely by malice" to puncture qualified privilege). Malice is defined as either a reckless disregard for the truth, or a motivation arising from spite and ill will. *Liberman v. Gelstein*, 80 N.Y.2d 429, 438 (1992). To show a reckless disregard for the truth, there " 'must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth" ' of his or her statements. *Id.* (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1964)).

Here, plaintiffs assert that Meleck knew de Ratafia was not a "dangerous person." Further, the complaint alleges that Meleck knew de Ratafia had not made "veiled threats" to him, had no

intention of hurting him and knew de Ratafia had not drugged Meleck's drink as he claimed to the

defendant Deputy Sheriffs on October 16, 2011. Plaintiffs assert that Meleck made these false

statements maliciously. The Court notes that the various cases defendants rely in support of their

motion to dismiss are summary judgment cases, which are inapposite to the present 12 (b) (6)

motion. The Court finds that, crediting plaintiffs' allegations at this early stage of the litigation,

they have sufficiently stated a claim for defamation against defendant Meleck.

5.     Negligent and Intentional Infliction of Emotional Distress

To sustain a claim for intentional infliction of emotional distress (hereinafter, "IIED"), a

plaintiff must demonstrate: "(1) extreme and outrageous conduct, (2) intent to cause severe

emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe

emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir.1996) (citing *Howell v.

New York Post Co.*, 81 N.Y.2d 115, 121 (1993)). As the Court explained in *Campoverde v. Sony

Pictures Entertainment*, No. 01 Civ. 7775, 2002 WL 31163804 at *11 (S.D.N.Y. Sept.30, 2002),

"New York courts have imposed a very high threshold for intentional infliction of emotional

distress claims, requiring that the conduct must be so outrageous and extreme 'as to go beyond all

possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

community.' " *Id.* (quoting *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 303, (1983)). The

question of whether a complaint adequately alleges such grievous allegations is a question to be

determined by the Court. See *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (affirming

dismissal of a claim for IIED on the grounds that the complaint failed to allege sufficiently

egregious acts, and stating that "[w]hether the conduct alleged may reasonably be regarded as so

extreme and outrageous as to permit recovery is a matter for the court to determine in the first

-30-

instance").

To state a claim for negligent infliction of emotional distress ("NIED"), plaintiffs must allege conduct that "was so outrageous and extreme as to support a claim for emotional distress," which is the same standard used in intentional infliction of emotional distress cases. *Acquista v. New York Life Ins. Co.*, 285 A.D.2d 73, 83 (1st Dep't 2001); Dillon v. City of New York, 261 A.D.2d 34, 41 (1st Dep't 1999) ("We have applied the same standard to both the intentional and negligence theories of emotional distress ... [which] must be clearly alleged for the pleadings to survive dismissal.").

The Court determines that the conduct alleged in plaintiffs' complaint insofar as the claims against defendant Meleck fails to meet the extremely high threshold established under New York law for maintenance of either an IIED or NIED claim. In *Campoverde*, for example, the court dismissed a claim for IIED even where the operative complaint alleged that the defendants' employees were "abusive" and "threatening," "kept plaintiffs behind a shut and guarded door" while refusing to let them leave, and ultimately threw them onto the street, concluding that the acts alleged were not sufficiently egregious to meet the high standards established for such claims. *Campoverde*, 2002 WL 31163804 at *12. Unlike *Campoverde*, plaintiffs herein have not even alleged in their complaint that defendant Meleck made abusive and threatening statements, nor made any deliberate falsehoods beyond the giving the allegedly false statements to the defendant Deputy Sheriffs. *Compare also Kaminski v. United Parcel Service*, 120 A.D.2d 409, 412 (1st Dep't 1986) (concluding that a former United Parcel Service employee who was allegedly locked in a room with supervisors and was for more than three hours subjected to threats, coercion, harassment and obscene and aggressive language had adequately stated an IIED claim); *Bender*,

-31-

78 F.3d at 791 (concluding that plaintiff who had allegedly been subjected to physical abuse and obscene and aggressive language by arresting police officer while under the control of the officer had sustained her IIED claim).

Nor have plaintiffs alleged any course of conduct or scheme by Meleck with the intent to cause emotional distress of the type that has survived motions to dismiss. *See e.g., Mejia v. City of New York*, 119 F.Supp.2d 232, 285 (E.D.N.Y.2000) (concluding that an alleged extended course of conduct intended to cause emotional distress could give rise to recovery, even if "certain of plaintiffs' allegations would not, by themselves, necessarily rise to the level of extremity and outrageousness to support" such a claim), *and Bower v. Weisman*, 639 F.Supp. 532, 541 (S.D.N.Y.1986) (concluding that defendant who allegedly "embarked upon a course of conduct that was designed to intimidate, threaten and humiliate the plaintiff" could be found liable for IIED).

Here, plaintiffs assert that Meleck made false allegations to the defendant Deputy Sheriffs when he asked them to speak to de Ratafia on October 16, 2011. These allegations do not describe conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Brown v. Sear Roebuck & Co.*, 297 A.D.2d 205, 212 (1st Dep't 2002); are insufficient; *Druschke v. Banana Republic, Inc.*, 359 F. Supp.2d 308, 314 (S.D.N.Y. 2005) (allegations by customer against retail clothing store that store employees called the police and falsely told police that customer created fraudulent receipt from scratch did not state claim for intentional infliction of emotional distress absent allegations of conduct that went beyond all possible bounds of decency). Moreover, plaintiffs assert in the complaint that Meleck's conduct

-32-

was intentional and, as referenced above, if his actions were allegedly "intentional and deliberate in their nature . . ." they are "outside the ambit of actionable negligence." *Jones*, 153 Misc.2d at 825. Consequently, the Court finds that plaintiffs' intentional and negligent infliction of emotional distress claims against defendant Meleck in Counts XIV and XV must be dismissed.

6.      County Defendants' Objections to Dismissal of Claims Against Meleck

While the County defendants agree that plaintiffs have failed to state a claim pursuant to 42 U.S.C. § 1983 against defendant Meleck, they contend that if Meleck provided the County defendants with "false information," they would be entitled to defense, indemnity, contribution, costs, disbursements and attorneys' fees from Meleck. The County defendants note that it was Meleck's report to police that triggered the allegations in the complaint and but for Meleck placing the 911 call and reporting the alleged incident involving the plaintiffs, the County defendants would not have arrived at the plaintiffs' home. Thus, the County defendants claim that if the Court dismisses defendant Meleck from this action, they still have the right to assert third-party claims against him. Consequently, they oppose Meleck's motion to dismiss the complaint against him.

Counsel for defendant Meleck argues correctly that federal law does not provide a basis for contribution for liability under Section 1983. *Crews v. County of Nassau*, 612 F.Supp.2d 199, 210 (E.D.N.Y. 2009). As a further matter, since the County defendants have not interposed any claims against Meleck concerning their liability on plaintiffs' common law claims, the Court will not deny Meleck's motion to dismiss the complaint on the basis of mere hypothetical liability for contribution claims that have not yet been asserted against Meleck.

**IV.      CONCLUSION**

Based on the foregoing, it is hereby

ORDERED that the motion to dismiss for failure to state a claim by defendant Columbia County (Dkt. No. 76) is GRANTED as follows:

It is hereby ORDERED that the all of the claims in the complaint against defendant Harrison in his official and personal capacities are DISMISSED with prejudice; and it is further

ORDERED that the all of the claims in the complaint against the defendant Columbia County are DISMISSED with prejudice; and it is further

ORDERED that the claims against the defendants Proper, Hyson and Rose in their official capacities are DISMISSED with prejudice; and it is further

ORDERED that the claims against defendants Proper, Hyson and Rose in their individual capacities in Count III (Fifth and Sixth Amendment Claims) are DISMISSED with prejudice; and it is further

ORDERED that the claims against defendants Proper, Hyson and Rose in their individual capacities (New York Constitutional Claim) is DISMISSED with prejudice; and it is further

ORDERED that the claim for injunctive relief against defendants Proper, Hyson and Rose in their individual capacities in Count XVI is DISMISSED with prejudice; and it is further

ORDERED that the motion to dismiss for failure to state a claim by defendant Meleck (Dkt. No. 78) is GRANTED in part and DENIED in part as follows:

It is hereby ORDERED that the claims against defendant Meleck in Counts I, II, III, X, and XI, to the extent that they assert liability pursuant to 42 U.S.C. § 1983 are DISMISSED with prejudice; and it is further

ORDERED that the claim against defendant Meleck in Count IV (New York

Constitutional Claim) is DISMISSED; and it is further

ORDERED that the claims against defendant Meleck in Counts V, VI, VII, VIII, IX and X (New York State and Common Law Claims) are DISMISSED; and it is further

ORDERED that the motion to dismiss the claim against defendant Meleck in Count XIII (Defamation) is DENIED; and it is further

ORDERED that the claims against defendant Meleck in Counts XIV and XV (Intentional and Negligent Infliction of Emotional Distress) are DISMISSED; and it is further

ORDERED that the motion by Columbia County (Dkt. No. 80) objecting to dismissal of defendant Meleck from this action is DENIED.

IT IS SO ORDERED.

Date: September 26, 2013

Norman A. Mordue
Senior U.S. District Judge